The next case before us this morning is 23-1192 United States v. Joseph. May it please the Court. My name is Elizabeth Franklin Best. I'm privileged to be here and to argue this case on behalf of Dr. Francis Joseph. And if I could please reserve about five minutes of rebuttal time, I would appreciate it very much. And that is on you to try and protect that. Okay. Just be aggressive with us because we're pretty bad at protecting your time. Okay. Thank you, Your Honor. So what makes this case very different from another from a number of other COVID related fraud cases that are currently percolating throughout the federal courts right now is that the events here indisputably occurred in the context of a very highly acrimonious business dispute. The business dispute very much impacted the way that Dr. Joseph was behaving during this time and offered valuable insight into his mental state at the time that he secured these loans. This isn't a case, and I think of them as sort of the easy cases where the borrower secures the loans and buys luxury goods or takes extravagant vacations where they are alleging fake businesses and fake employees. I mean, in addition to spending money here on legal fees and Dr. Joseph's efforts to wrest back control of his business, he was making the same kind of expenditures that he did before. That is a relatively minor piece of it, though. I mean, that was $4,000, $4,500. Child support, a minor piece of it. Well, those are expenditures that he was making prior to all of this, to taking these loans out as well. I mean, so yes, I mean, he was going out to dinner. He was spending it on child support. He had a bankruptcy attorney. He also had a family court attorney. So there were those sorts of expenses. Again, what he had been using, what he had been taking money from the business to support his lifestyle prior to taking these loans. Yes, I mean, look, there's no question that the government proved and that Dr. Joseph conceded that he was fraudulent. And he also... And used them for personal purposes. And he acknowledged that, Your Honor. He absolutely acknowledged it. But what he believed he was... Well, the acknowledging it doesn't mean that it wasn't fraudulent. No, absolutely. Absolutely. I mean, this is why fraud is different, right? I mean, because it matters what his mental state was. And at the time that he was taking these loans, he did so because COVID was wrecking his business. Eric Papolini was also wrecking his business. Well, the evidence on COVID wrecking his business, the jury had evidence before it from which it could have reasonably found that that was not true. But I think, Your Honor, I mean, I know that there was the one witness who said, oh, there was no decline in the business. But respectfully, Your Honor, I mean, we don't really know that the jury necessarily fully credited that testimony because I mean, the world... I mean, you're arguing that there wasn't sufficient evidence for the jury to find mens rea, right? For mens rea, correct. Correct. Yeah. And so we have to look and say whether based on this evidence, there was enough that a reasonable jury could find. And so we take the evidence in the light most favorable to the verdict. Well, absolutely, Your Honor. And so if we just concede that there was absolutely no sort of impact on the business at this time, we still know, because it's part of the public record, that there was this business dispute with Eric Papolini, who, according to the Chapter 7 bankruptcy trustee, was actually sort of raiding SMA of its funds during this time period. I mean, and that is something that, you know, is a huge sort of part of this. And this is what Dr. Joseph... Was that a two wrongs make a right argument? No, not at all. Again, this goes back to his mental state, and this is what he was up against at the time that he's taking out these loans. Don't you have... I mean, don't we have to also look at things like there seemed to be some tricky maneuvering with the money, opening up various bank accounts, moving the money through them, moving the money through kids' bank accounts? Absolutely. I mean, doesn't that suggest a mental state of trying to hide something and be fraudulent? He was moving the money into other accounts. That's absolutely true. It's well documented. Couldn't a reasonable juror conclude that that was evidence that he was intending to hide things and be fraudulent? If the jury had heard the full story of what was happening around this time with the business, then absolutely. But I mean, that is sort of the key problem here. Okay, so this is your argument that the court abused its discretion by not allowing more. By not allowing. There was quite a lot that came in that he was in a dispute with his business partner, and that he went in and tried to fire people after he was fired, and he did it because he didn't think his firing was valid. I mean, a lot of evidence came in, and so you have to convince us that the district court abused its discretion by saying, enough already. Okay, so let's talk about Dr. Joseph's testimony. I mean, so when he took the stand to put his defense on the record, the district court judge repeatedly prevented him from going into matters related to his, this problem with Eric Papalini. In fact, within the first five pages of Dr. Joseph's testimony, the trial court judge had shut him down three times. Then he enlisted the government to also start interceding to keep this evidence from coming out. And so then when Dr. Joseph was trying to... Are you saying that no evidence at all got in on the dispute with Papalini? No, some did. I mean, some did, but not a fulsome amount of this. I mean, you could... Can you point to us, by verse and phrase, on pieces of evidence where there's an abuse of discretion for sustaining an objection? Certainly. So, I mean... You're making it sound like it was pervasive. I believe it was, Your Honor. Well, it is true that he was able to testify about the civil dispute with Papalini. He was not allowed to talk about the fact that Papalini was engaged in fraudulent activities with regards to the billing, which, again, in the bankruptcy complaint that was filed... But as you're reading the transcript, it's... And he claimed that Papalini forged documents... Yes. ...to gain access and exclusive control. He talked about the civil dispute. He talked about his attempt to fire Papalini. Well, except that at page, of the record, 814, the judge said he did not allow him to talk about Papalini's fraud. Then he claimed, we're not here trying a civil dispute between Dr. Joseph and Papalini. Then he said, we're not going to get into the details of who is right and who is wrong. There are significant limitations on Dr. Joseph's... The judge, using the judge's discretion, was saying, well, that and some. There's a dispute. You claim fraud. But as to the details, ins and outs, you know, enough. How is that an abuse of discretion? Because, again, it did not give... I mean, as a fraud case, the main issue here is what Dr. Joseph's mental state was. So it was the position that my client was being defrauded by his partner. He was being put in dire financial straits. He couldn't keep his business going. So he had to go out and seek these funds. And it was all because of so-and-so. He didn't really want to defraud the government. He was forced into it by Mr. Papalini. He was seeking the funds at the time when a lot of people were seeking the funds. But, I mean, again, part of this business dispute is why there were no funds in the business to begin with. I mean, that's why there needed to be sort of funds coming in. But the funds weren't going into the business. He was taking them away from the business. Well, this was a part when he was trying to expand the business. That's how Eric Papalini got involved here in the first place. He made a $250,000 cash infusion, took over control of the finances of the company. I mean, all of this, I think, was incredibly important in understanding what Dr. Joseph's mental state was at the time that he was securing these loans and the placement of them in the children's bank accounts. Well, he testified, this is what I thought and this is why. I mean, the jury was told the perspective of Dr. Joseph about why he was doing this and that he thought that he had a right to do it because of this dispute with Papalini. I mean, the trial court, can you point us to a case that basically says you have to have a mini-trial on a civil dispute in the middle of your criminal trial? I mean, I guess respectfully, Your Honor, I mean, I don't think that he was asking to do too much. I mean, he was asking to admit an exhibit, for example, that showed that somebody else had taken over sort of the stock control of the business. I mean, and that is something, again, the bankruptcy judge has found that that information was kept from Dr. Joseph at the time that this was occurring. So what was your evidentiary basis for getting that exhibit in? That it was relevant to show that Dr. Joseph really, that something was wrong in Denmark. I mean, that something was going on here, that these allegations of this fraud with Mr. Papalini were not just paranoia. Did someone on the other side say, objection, hearsay, lack of foundation? I believe so. And what was your response to that? Your Honor, I really do not recall at the time. Right. I mean, there are other evidentiary issues, is my point with your exhibit, other than, you know, the exclusion of relevant evidence. Understood, Your Honor. Isn't the court's approach of allowing some of this testimony in about the dispute, about the claims of fraud, but then stopping at one point, and that is too much detail. Isn't that verified by the fact that the evidence got in that there was a court order in state court? I mean, doesn't that verify exactly what the district court was doing? You can do it all, but not. There's a court order verifying that Papalini had taken over and operating, verifying you're being fired, and prohibiting you from dealing with the ins and outs of the company. Doesn't that? The court order was there. Despite that court order, Papalini proceeded to take $1.9 million out of that. But be that as it may, when Dr. Joseph, who started this business back in 2014, believed that he was going to gain control back, did not know that he had been removed as the stock owner. I mean, these are, again, sort of... So you're saying the evidence indicates he had no idea of the two court orders. No, he knew of the court order. The first one being on May 7th. He knew of the court order, but he still believed he was going to be able to get control of the business back because he believed he was the sole owner, the stock owner. But what happened, and this is what the bankruptcy court, this is why there are about 20 counts against him for fraudulent conveyances, is that Dr. Joseph was purposefully kept from information regarding the transfer of that ownership. I'm going to warn you of your time. I'm sorry. If I could have two minutes back on rebuttal, I would appreciate it. You've got 2.09. Okay, thank you. Good morning, Your Honors, and may it please the Court. John Miolas for the United States. In this case, a jury convicted Defendant Joseph for defrauding two United States government programs established to help people and businesses in need at the height of the COVID-19 pandemic. This court should affirm that jury's conviction and the district court's judgment for three principal reasons. First, the trial evidence sufficiently established the defendant's intent on the counts of conviction. Second, the district court did not abuse its discretion at trial. And third, the district court did not err in sentencing. Joseph raises seven issues on appeal, but they're disposed of in those three buckets, which this court generally views with deference to the jury and the district court. Starting with the sufficiency of the evidence, this court has already articulated there was significant evidence from which a reasonable jury, viewing it in the light most favorable to the United States and taking all inferences in that light, as this court is bound to do, for the reasonable jury to convict the defendant here. As to some of that evidence, both the AAP and the PPP had numerous false certifications on them at the time that they were submitted, which goes to his intent at the time. There's also the movement of the funds through different bank accounts, the establishment of a new bank account. And I believe the argument from Dr. Joseph is that you have to show my mens rea at the time I submitted the application and therefore you're not allowed to look at any evidence that happened after I submitted that application. So two responses, Your Honor. First, that's sort of an artificial limitation on permissible inferences. The Trammell case shows that misspending of money after the fact, you can infer fraudulent intent prior to that. But even if you remove that, there was significant evidence at the time of both applications of fraudulent intent. You have in January of 2020, the joint action agreement with Papalini, which states that Papalini is in control of the finances and the employees of Springs Medical. Then you have the day the CARES Act is passed by Congress on March 27th. Joseph opens up a bank account for Springs Medical in which he's the sole signatory. Then the day after, March 28th, he applies for the AAP funds, makes false certifications on the form at the time, saying that he's the authorized representative entitled to do so despite the language of the joint action agreement. And then in the ensuing events leading up to the June PPP application, there's even more evidence from which to infer fraudulent intent. Then you have the Fountainhead application, which he tried in early April to apply for PPP funds using the employee identification number of Springs Medical. That was bounced because Fountainhead said there was another application using the EIN. And then in June, he goes ahead and changes numerous things on the form itself, including using his Social Security number instead of the EIN. He changes the amount requested, the employees, the form of the business, the address of the business. And that was after the May 7th court order. That was after the mutual firing, but the firing of Joseph by Papalani. So, you know, all of this and viewing it in the light most favorable to the United States, plus the movement of the funds and the misspending afterwards, which the Trammell case supports using, goes to show that a reasonable jury certainly could have concluded that he had the requisite mental state on these points. Moving to the limitation on the defense, there was no abuse of discretion here. It was well within the bounds of permissible choice on the issue. There was no secret that something was wrong in Denmark. The jury was well aware that there was civil litigation here. It was discussed throughout. And he was given Joseph's significant latitude, both throughout trial and on his testimony, to establish the point that he believed he would regain control of the company and thus lacked fraudulent intent. He was allowed to testify about the civil dispute. He was allowed to testify about his attempt to fire Papalani, his belief that he was allowed to use the federal funds because he was the owner of Springs Medical and that it was his salary. He talked about how he reported Papalani for fraud. He introduced documents that he claimed Papalani forged to take over the account. So it certainly is not arbitrary, capricious, or whimsical for the district court to draw a line after all of this had come in. And the exhibit that we're talking about was on redirect after he had already had the opportunity to establish all of this. And even with the very exhibit itself, he was allowed to establish with his testimony what the exhibit showed was that he believed it to be fraudulent. So, you know, in all of that context, it can't be said to be an abuse of discretion. And even more so, even if it was, it's harmless error because that one exhibit only went to one of the certifications on the PPP form, and there are numerous false certifications. So even if you take out that one certification, there's significant evidence on the form itself of false certifications. Let me shift your focus for a minute to the lay testimony of the accountant, Mr. Petron. You know, the government missed its deadline to designate the expert. They had him teed up as an expert. And so they just said, oh, well, we'll put him on as a lay witness. The testimony is a very involved forensic analysis of bank accounts, multiple bank accounts, multiple transactions. And then the application of an accounting principle called the intermediate balance rule. I think our case law would say that this was an expert, not a lay witness, and that you can't just put a different hat on your expert and get expert testimony in without complying with the expert deadlines and disclosures. Tell me why I'm wrong. Certainly, Your Honor. So there was no expert testimony at trial. There wasn't testimony as to a specific funds tracing rule, the lowest intermediate balance rule. But he applied a specific funds tracing rule to do it, didn't he? He didn't just get out a whiteboard and some bank accounts and start showing them how it all worked. In fact, if you use his testimony, it doesn't exactly track how he did everything. He left out the magic words of his complex accounting techniques. So, Your Honor, he only used simple arithmetic here. Well, maybe I'm too simple, but that was a lot of arithmetic. It was essentially balancing a checkbook. Well, it was multiple checkbooks, multiple accounts, multiple transactions. And importantly, there are many ways in which you can look at a bank account and trace. And that's what he's doing. He's tracing. And he picked A, accounting method, the intermediate balance rule. It's not the only accounting method. And he applied that method to come up with his explanation of what happened in those accounts. So, Your Honor, he didn't actually attempt to. So just taking a step back, what happened here was we had originally noticed that he was going to use tracing methods. Joseph objected. The court held a hearing pretrial, gave us two choices, a continuance to notice it up and allow him to rebut it, or to proceed to trial on the notion that he could only use pure arithmetic. And we chose option two. We readjusted all the exhibits, and pure arithmetic is all he applied. He used a method of accounting. So there had to be some. Yes, there did. Addition and subtraction was all he used. Well, no, he didn't just do addition and subtraction. He had to apply a judgment of when the withdrawals from an account changed from his use of his personal funds to his use of the loan funds. So, Your Honor, a way to think about it, there's no dispute that the withdrawals and deposits actually happened, right? And so his method would apply as such to a simple example. In the morning of day one, there's $1 of non-government money in an account. $10 of government money comes into the account, and at the end of the same day, $10 goes out. So there's $1 left at the end of the day. He would have said, and nobody disputes that those transactions happened, he would have said that of the $10 that went out, at least nine of it had to be government money. And that's just pure addition and subtraction. Well, it doesn't always work out that cleanly, as your example. And there are different accounting methods. He could have done FIFO, first in, first out. He could have done LIFO, last in, last out. I mean, there are theories of accounting that when you hire a forensic accountant, they use in applying math. And we have case law, James River Insurance Company, that if a technical judgment was required to select an appropriate methodology to follow the funds, you've crossed over from a lay witness into an expert. Indeed, Your Honor. And he didn't use any of those methods that you just described. So I think the two cases here are helpful. Well, if it was only math, he would have calculated all the loan funds, and he would have calculated all the personal funds, and he would have subtracted the personal funds from the loans funds, and it would have bounced and said, here's the math, this is what he spent. That's not what he did. Essentially, it is on a daily basis, right? And so the Bryant versus Farmer Exchange case and the James River cases are helpful to sort of set the spectrum here. Well, farmers, we talk about if anyone with a grade school education could do it. Do you think someone with a grade school education could have done what your witness did in this case? Respectfully, Your Honor, with time, I think so, because in farmers, they talk about a statistical determination of taking the average of 103 numbers, which involves multiplication and division, whereas here it's just addition and subtraction. But it requires assumptions. He had to make some assumptions and use some rules to make his calculations. He didn't just have to say, okay, I'm going to add this and subtract that every day. The assumption being the most conservative possible in favor of the defendant to describe the math that is undisputed and the transfers that are undisputed. Does it make any difference to you? What struck me was he began his testimony by explaining that he was a CPA and all these years of experience and, you know, I don't remember all those credentials, but there were a lot of them that are irrelevant if your purpose is to say, our expert is just going to get up here with the whiteboard and show you simple math on how this money was stolen, basically, by the good doctor. But instead, it makes it sound like, believe our expert in his simple math, because our lay witness is actually an expert in the field. He's a CPA. He's a certified financial analyst. He's a forensic this. He's a this and that. As Your Honor recognizes, the rules don't talk about lay and expert witnesses. They talk about lay and expert testimony. So simply because someone has the credentials to be an expert on certain topics doesn't make testimony expert testimony when it's based on pure math. And I think important. And just because you call him a lay expert doesn't mean his testimony is lay testimony. Understood, Your Honor. And important. Let me assume for a minute that we don't agree with you, or at least some of us don't agree with you. Certain. Is it harmless? I think there's a harmless argument for sure, because the agent traced a lot. Not traced, but followed a lot of this money and described what it was being used for. So some of the testimony was cumulative. And I also think it's important to consider that this is an abusive discretion standard, and the district court was policing its own pretrial ruling here. If you look at 590 in the record, the district court interjected to ask about the math. The court interjected repeatedly. Now, you're just doing math here, right? And we also had a sidebar about the exhibits where he confirmed that we had conformed them to his ruling. And respectfully, the district court was in the best position to police its own ruling, was sensitive to this question, and repeatedly returned to it to ensure that what was happening was in conformance with its pretrial ruling. Were all the bank accounts, the bank records, in evidence? Yes, the underlying records were as well. And the agent testified about them? And would you agree that the agent testified more in the McHugh-Carson method of tracing than the lay witness did? The agent didn't do the full arithmetic. He was following certain funds and had more color on what they were used for, given that he had additional insight from interviewing the defendant and looking at the rest of the investigation. So it wasn't fully cumulative. They complemented each other, but there was a lot of overlap in terms of following the funds, which counsels for harmless. And did the agent's testimony cover both the APP transaction and the PPP transaction? Yes, Your Honor. I see my time is up. And Dr. Joseph himself admitted to improper transfers of the funds, correct? He did as well, yes. All right. Thank you. Thank you, Your Honor. Thank you, Your Honors. So yes, Dr. Joseph did admit that some of these expenditures were improper. He also testified, though, that he believed that pursuant to the terms and conditions of these loans, that he would be able to repay them at a favorable rate. So just to sort of make that clear. What difference does that make? If he had false information on his application, you know, it's like the embezzler. You know, I always intended to pay it back. Sure. It doesn't change the fact that he fraudulently obtained the funds. Well, but what is characterized as sort of the false certification, Your Honor, I think are characterized based on sort of the government's view of it. I mean, I think that Dr. Joseph legitimately believed that he had control of this company. I believe that he believed that he had the authority to get these loans because this had been his business since 2014. He had run it at a profit. He was looking to expand. And then all of a sudden he meets this Eric Papalini and he signs this joint agreement and everything kind of gets taken away from him. But just to sort of briefly talk about this expert, Mr. Patron, I would just sort of point out that he also testified he had two master's degrees. I believe he also was paid. Let me ask you guys that. And specifically as to count one, the APP transaction, that was almost an instantaneous transfer. I mean, I think even I could do the math on that. The money of $87,000 come in on day one, and either later on day one or on day two, $92,000 go out. I mean, there's a deficit in the account. But it immediately went out and for not the purposes indicated in the loan, correct? Well, it went into— Or the Medicare. I'm sorry, Your Honor. I mean, it went into a child's bank account. I mean, that's for sure. And that is because— And that's a problem, isn't it? He believed that Papalini was stealing the money because Papalini was. Okay, that's one spin on it, you know. But aren't we supposed to put the spin on it that favors the government? I mean, if I could just sort of finish that response, Your Honor. I just—I mean, this is what I think is sort of the fundamental sort of unfairness of this. I don't think that the jury heard the full story. I don't think that they heard everything that they needed to hear about this business dispute that was driving Dr. Joseph's actions in these cases, Your Honor. Thank you. Thank you. We'll take this matter under advisement.